**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

In re:                                                  Chapter 11

     GLOBAL FERTILITY & GENETICS,              Case No. 23-10905 (PB)
     NEW YORK, LLC,

                Debtor.


-------------------------------------------------------------------x

## MEMORANDUM DECISION CONFIRMING DR. HU BO'S CHAPTER 11 PLAN OF REORGANIZATION


**APPEARANCES:**

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019
By: Andrew Rosenblatt, Esq.
and Judith Archer, Esq.

*Counsel for Dr. Hu Bo*

SPENCE LAW OFFICE, P.C.
55 Lumber Road, Suite 5
Roslyn, New York 11576
By: Robert J. Spence

WESTERMAN BALL EDERER MILLER ZUCKER
& SHARFSTEIN, LLP
1201 RXR Plaza
Uniondale, NY 11556
By: Thomas A. Draghi and
Jay S. Hellman

*Co-Counsel for Annie Liu*

FARRELL, FRITZ, P.C.
622 Third Avenue, 37th Floor
New York, New York 10017
By: Martin G. Bunin

*Counsel for the Chapter 11 Trustee*

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
One Bowling Green
New York, New York 10004
By: Mark Bruh and Andrew Velez-Rivera


**Philip Bentley**
**U.S. Bankruptcy Judge**

1

I.    **Introduction** ........................................................................................................ **3**

II.   **Factual Background** ........................................................................................... **5**

   A.   The Debtor's Business ..................................................................................... 5

   B.   The Debtor's Bankruptcy Filing ..................................................................... 7

       i.   Dr. Hu's Offer to Serve as a Stalking Horse Bidder .................................. 8

       ii.   The Debtor's Plans and the Liu/Doody Plan ........................................... 8

       iii.   Appointment of a Chapter 11 Trustee ..................................................... 10

       iv.   Dr. Hu's Plan .......................................................................................... 12

       v.   Ms. Liu's Plan ......................................................................................... 13

   C.   The Confirmation Hearing ............................................................................ 14

III.  **Discussion** ........................................................................................................ **17**

   A.   Approval of the Disclosure Statement is Not Necessary. .............................. 17

   B.   The Plan Satisfies All Provisions of Section 1129(a) Except Section 1129(a)(8)........... 18

       i.   Section 1129(a)(1) .................................................................................. 18

          1.   Section 1122 ...................................................................................... 18

          2.   Section 1123(a) .................................................................................. 18

          3.   Section 1123(b) .................................................................................. 21

       ii.   Section 1129(a)(2) .................................................................................. 24

       iii.   Section 1129(a)(3) .................................................................................. 25

       iv.   Section 1129(a)(4) .................................................................................. 28

       v.   Section 1129(a)(5) .................................................................................. 28

       vi.   Section 1129(a)(7) .................................................................................. 29

       vii.   Section 1129(a)(9) .................................................................................. 30

       viii.   Section 1129(a)(11) ................................................................................ 30

   C.   The Plan Satisfies Section 1129(b) With Respect to the Non-Consenting Equity Class.. 31

       i.   Satisfaction of the Absolute Priority Rule Does Not By Itself Satisfy Section 1129(b)'s "Fair and Equitable" Requirement ...................................................................... 32

       ii.   The Record Does Not Demonstrate That the Debtor's Equity Has Value. .................. 38

          1.   The Debtor has no equity value on a standalone basis. .......................... 38

          2.   Ms. Liu has failed to show that the Debtor's value to an acquiror exceeds the amount of its debts. ................................................................................................................ 39

IV.   **Conclusion** ...................................................................................................... **45**

## I. INTRODUCTION

This case raises the unsettled issue of what cram-down requirements protect equity holders when a plan of reorganization pays creditors in full and seeks to extinguish all equity interests for no consideration. Such a plan satisfies the absolute priority rule, as codified in section 1129(b)(2)(C)(ii) of the Bankruptcy Code, since no junior class of equity receives a distribution. The question before the Court is what additional requirements, if any, are imposed by section 1129(b)(2)'s "fair and equitable" standard. In particular, if the record indicates that the equity being extinguished may have significant value, does this potentially defeat cramdown?

While the case law on this issue is surprisingly sparse, the Court concludes that the language and legislative history of section 1129 compel an affirmative answer to this question. This does not mean that a formal valuation of the equity is required, as may be the case when cramdown under section 1129(b)(2)(C)(i) is invoked. It does mean that, if evidence in the record indicates the equity may have value, the court must determine whether that is in fact the case and, if so, whether the extinguishment of equity for no consideration over the equity class's objection is fair and equitable.

Making this determination in the present case is not simple. The Debtor owns a fertility clinic in Manhattan, which it manages in conjunction with an affiliated medical practice. The Debtor is 100% owned by a holding company, which itself is majority owned by a Chinese investor, Dr. Hu Bo, and minority owned by the Debtor's former CEO, Jun Jing "Annie" Liu. Shortly after the Debtor's June 2023 bankruptcy filing, Dr. Hu made repeated offers to buy the Debtor, including offering to serve as a stalking horse in an auction process. Ms. Liu rebuffed each of these offers. After exclusivity expired, Dr. Hu filed a plan of reorganization—the plan now before the Court (the "Plan" or "Dr. Hu's plan")— which would pay creditors in full, extinguish

3

the Debtor's equity for no consideration, and give the reorganized debtor's equity to a company created by Dr. Hu. Days before the start of the confirmation hearing on the Plan, Ms. Liu—who had been replaced by a chapter 11 trustee and then terminated as CEO due to her gross mismanagement of the Debtor—filed a competing plan. Her plan, which is backed by a private investment firm, not only would pay all creditors in full, with post-petition interest; it would also pay $1 million to the Debtor's equity holder. Ms. Liu objected to Dr. Hu's plan and asked the Court to adjourn the confirmation hearing so that confirmation of the two plans could be considered in tandem.

The Court held a four-day hearing on confirmation of the Plan in July, followed by post-trial briefing. Based on the record of that hearing, the Court finds that Ms. Liu's principal objection to the plan—that the Debtor's equity has value and therefore its extinguishment for no consideration violates section 1129(b)'s fair and equitable requirement—lacks merit. The record makes clear that, when the Debtor is valued on a standalone basis, its equity has no value. Although the Debtor may have more value to an acquiror, only one timely and confirmable offer has been made to acquire the Debtor, and that offer—the Plan—values the equity at zero. Ms. Liu's plan purports to value the Debtor's equity at $1 million, but her plan is unacceptably late. In addition, based on the record before the Court, her plan appears to be unconfirmable, and even if not, it may be inferior to Dr. Hu's plan. Ms. Liu therefore has failed to show that the Debtor's equity has value or that cause exists to adjourn confirmation to permit formal consideration of her plan. The Court will enter an order confirming the Plan, which satisfies the Bankruptcy Code's confirmation requirements.

## II.    FACTUAL BACKGROUND[1]

### A.    The Debtor's Business

The Debtor is a Delaware LLC that owns and manages a fertility clinic in Manhattan, which serves mostly international patients from China. Since its incorporation in 2016, the Debtor has been 100% owned by GFG Holding Group Co., LLC ("Holdings"). Dr. Hu Bo holds a 70% ownership interest in Holdings, and Ms. Liu and an affiliated physician, Dr. Kevin J. Doody, each own 15% of Holdings. From the Debtor's inception until her termination on June 7, 2024, Ms. Liu was the Debtor's CEO and sole director.

Because New York law bars the so-called corporate practice of medicine,[2] the Debtor does not itself provide medical services. Instead, since 2019, the Debtor has partnered with Dr. Doody's medical practice, KJD Medical, PLLC ("KJD"), with KJD providing medical care to patients seeking fertility treatment and the Debtor providing KJD with management and administrative services, as well as the laboratory and equipment at the Debtor's Manhattan facility. Because Dr.

---

[1] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. The findings and conclusions are based the testimony given and the exhibits admitted at the four-day confirmation hearing held in July 2024. The Court has not attempted to distinguish between findings of fact and conclusions of law. Instead, all determinations of factual issues shall be deemed findings of fact, and all determinations of legal issues shall be deemed conclusions of law. *Cf. Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405, 413–14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

[2] "New York law prohibits unlicensed individuals from organizing a professional service corporation for profit or exercising control over such entities." *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 404, 128 N.E.3d 153 (2019); *see also* N.Y. Bus. Corp. Law §§ 1503[a]-[b], 1507, 1708. In the medical context, the underlying policy concern is "that the so-called 'corporate practice of medicine' could create ethical conflicts and undermine the quality of care afforded to patients." *State Farm Mut. Auto. Ins. Co. v Mallela*, 372 F3d 500, 503 (2d Cir 2004). New York common law "has long recognized the need to ensure that providers of professional services are not unduly influenced by unlicensed third parties who are free of professional responsibility requirements and may disregard patient care in operating a 'corporation . . . organized simply to make money.'" *Carothers*, 33 N.Y.3d at 404 (quoting *In re Co-operative L. Co.*, 198 N.Y. 479, 484 (1910)).

Doody resides in Texas, the primary physician providing patient care at the Debtor's facility is Dr. Melvin Thornton, an employee of KJD. Medical partnerships of this sort, between a management services organization (here, the Debtor) and a "friendly PLLC" medical practice (KJD) are common. *See generally* Francis J. Serbaroli, *Ownership of Medical Practices in New York and the Role of Private Investors*, N.Y.L.J., July 24, 2017, at 3-4, https://perma.cc/HV2A-VGAR. Typically, such collaborations are governed by an administrative services agreement, which details the parties' respective roles and financial responsibilities. *Id.*

The Debtor's relationship with KJD has been typical in many respects. The Debtor and KJD have followed a customary division of labor, with KJD providing the medical care and the Debtor providing the non-medical services and equipment. In addition, at the outset of their relationship, the two parties prepared a typical administrative services agreement, under which KJD would provide health care services and collect all patient revenues, and in exchange for the Debtor's provision of non-medical services and equipment, KJD would pay the Debtor an annual $1.5 million management fee and pay all the Debtor's expenses. *See* purported Administrative Services Agreement (the "ASA"), dated July 11, 2019, at Art. IV; Art. V.

However, it appears that the Debtor and KJD never finalized or signed the ASA. Ms. Liu has repeatedly claimed the parties did reach a final agreement, and she has proffered a version of the ASA that appears to be executed by both parties. However, Dr. Doody disputes the authenticity of that document; he claims Ms. Liu substituted an executed signature page from another version of the document. As discussed further below, the Court considers Dr. Doody's testimony on this point more credible than Ms. Liu's and finds that, in all likelihood, the Debtor and KJD exchanged drafts of the ASA in 2019 but never reached agreement on key terms. What terms the parties thought governed their relationship in the years that followed remains a mystery, which the Court

6

has not attempted to plumb because doing so is not necessary to a decision on confirmation of Dr. Hu's plan.

The Debtor has lost money every year since its inception and has survived only because of Dr. Hu's willingness to fund the Debtor's losses year after year. Prior to the petition date, Dr. Hu provided funding to the Debtor on over 20 occasions, in the total amount of over $10 million, all as capital contributions rather than loans. Since the petition date, Dr. Hu has made additional capital contributions, totaling more than $150,000. Despite his very substantial equity infusions, Dr. Hu does not appear to have subjected Ms. Liu to much oversight over the years. *See, e.g.,* Dkt. 24, PCO Rept. at 5 ("Dr. Hu is not involved in the Debtor's operations.").[3]

**B.     The Debtor's Bankruptcy Filing**

The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on June 6, 2023. At the time of its filing, the Debtor had no funded debt obligations and no secured creditors. Its non-insider debt totaled approximately $816,000, most of which (over $540,000) was owed to its landlord. No creditor actions, such as eviction, foreclosure, or judgment enforcement proceedings, threatened to jeopardize the Debtor's operations. Instead, Ms. Liu testified, she made the decision to file the Debtor's chapter 11 case because of the Debtor's continuing cash flow shortfalls, which Dr. Hu had finally refused to cover. Dr. Hu, for his part, testified that he withheld funding because he became wary of Ms. Liu's ability to properly manage the Debtor. The parties dispute whether Ms. Liu consulted Dr. Hu before she filed the Debtor's chapter 11 petition.

---

[3] Dr. Hu resides in China, does not speak English, and does not personally conduct business in the United States. In August 2022, after he became concerned about Ms. Liu's management of the Debtor, Dr. Hu executed a power of attorney giving his daughter, Yihan Hu, the authority to act on his behalf in connection with all business transactions, as well as all claims and litigation, related to the Debtor and Holdings. Since that time, Ms. Hu has acted on her father's behalf on many such matters, including Dr. Hu's offer to serve as a stalking horse in an auction process, the development of Dr. Hu's plan, and the settlement with Dr. Doody.

*i.    Dr. Hu's Offer to Serve as a Stalking Horse Bidder*

Despite the Debtor's consistently poor financial performance, Dr. Hu seems to believe he can turn the business around. Shortly after the bankruptcy filing, Dr. Hu (through his daughter) approached Ms. Liu about the possibility of a sale of the Debtor's assets, with Dr. Hu or an entity he owned or controlled serving as a stalking horse bidder. In October 2023, Dr. Hu made a formal offer to serve as a stalking horse bidder for the sale of substantially all of the Debtor's assets. Dr. Hu's initial bid would have been sufficient to pay all non-insider creditors in full. Dr. Hu subsequently made two successive enhanced offers, but Ms. Liu rebuffed each one without making a counter-offer. Dr. Hu testified that Ms. Liu became uncooperative after his counsel revealed that he intended to terminate Ms. Liu's employment if he won the proposed auction.

*ii.    The Debtor's Plans and the Liu/Doody Plan*

On December 5, the last day of the Debtor's exclusive period to file a plan, the Debtor filed a placeholder plan. Under that plan, Ms. Liu and Dr. Doody (in place of Holdings, the current equity holder) would acquire 100% of the equity of the reorganized Debtor in exchange for a "new value" contribution comprised of three main components: a $100,000 cash contribution by Ms. Liu and Dr. Doody, a waiver of Ms. Liu's claims against the estate, and a commitment by KJD to pay the Debtor an annual management fee of $1 million ($500,000 less than the annual fee required under the purported ASA). The plan proposed to pay general unsecured creditors the full amount of their allowed claims, but over five years and without interest. While no hearing was ever held on this plan, its prospects for confirmation appear to have been minimal. Among other things, it

8

rested on historical and projected financials that made little sense.[4] In addition, the plan gave the reorganized Debtor's equity to insiders (Liu and Doody) without a market test, even though the plan impairs creditors' claims.[5]

On March 19, the Debtor filed an amended plan, which proposed to pay all general unsecured creditors in full on the effective date. It would have funded this payment by using a provision in the Debtor's operating agreement that required Holdings to make contributions at the direction of the sole director. However, Holdings has no assets of its own other than the equity of the Debtor, and Holdings' operating agreement contains no comparable provision requiring its members to capitalize the company on demand. The proposed funding therefore would have required Dr. Hu's consent, which he presumably was not willing to give. Consequently, this plan, too, appeared to be dead on arrival.

---

[4] As the Court observed at the March 29, 2024 hearing on the motion to appoint a trustee, "the projections annexed to the initial disclosure statement are, frankly, mind-boggling. . . . [T]hese numbers are just completely inconsistent with the notion [advanced by Ms. Liu] that the debtor [and KJD] have been operating under the [ASA]." Mar. 29 Tr. at 16:18-18:9. In addition, the Debtor provided no explanation for the hockey stick-like nature of its projections. See *id.* at 19:4-18 ("The Court: How do you get from . . . 1.3 million [in gross revenue] in 2022 to estimated gross revenues of $3.7 million in 2023 [in the SOFA and disclosure statement, respectively]?").

[5] Because the plan gave the reorganized Debtor's equity to insiders without paying creditors in full on the effective date, it could only have been confirmed over a dissenting creditor class if it satisfied the "new value" exception to the absolute priority rule. To satisfy that exception in this circuit, "the capital contribution by old equity must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization and (5) reasonably equivalent to the property that old equity is retaining or receiving." *BT/SAP Pool C Assocs. v. Coltex Loop Cent. Three Partners*, 203 B.R. 527, 534 (S.D.N.Y. 1996), *aff'd*, 138 F.3d 39 (2d Cir. 1998) (internal citations omitted). For old equity's participation to be "necessary" (factor # 4), "the market must be tested for other sources of funding and the debtor must be able to satisfy the bankruptcy court, with tangible proof, that the debtor would be unable to obtain funds from any other source or that no other source was willing to infuse the same amount of capital as old equity." *BT/SAP*, 203 B.R. at 535; *see also Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 458 (1999) ("plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).").

The Debtor's plan fell far short of satisfying these requirements. Most clearly, the plan did not subject the value of the equity to a market test. And given Dr. Hu's offer to serve as a stalking horse bidder with a bid sufficient to pay all non-insider creditors in full, the plan's chances of obtaining creditor approval appeared to be slim at best.

On March 27, Ms. Liu and Dr. Doody, through common counsel, filed their own plan of
reorganization, which proposed to sell the Debtor's business through an auction but contained no
offer to serve as a stalking horse. In addition to this deficiency, the plan raised serious conflict of
interest issues, as Ms. Liu filed the plan in competition with the Debtor's own March 19 amended
plan, at a time when she was still serving as the Debtor's CEO and sole director.

*iii.    Appointment of a Chapter 11 Trustee*

In December 2023, Dr. Hu moved for the appointment of a chapter 11 trustee, contending
that Ms. Liu had irreconcilable conflicts of interest and that the Debtor had failed to effectively
prosecute its bankruptcy case. After the initial hearing on Dr. Hu's motion, the U.S. Trustee in
March filed its own motion seeking appointment of a chapter 11 trustee. This motion raised
multiple additional grounds for a trustee's appointment, including evidence suggesting that Ms.
Liu had engaged in fraud or gross mismanagement.

The Court heard argument on these two motions on March 28 and, the next day, issued a
detailed bench ruling granting the motions and directing the appointment of a chapter 11 trustee.
The Court found that, while there was substantial evidence indicating that Ms. Liu may have
committed fraud, the Court did not need to make a fraud determination because, at minimum, Ms.
Liu had grossly mismanaged the Debtor. *See* Mar. 29 Tr. at 4:22-25. The Court further found that
Ms. Liu had irreconcilable conflicts of interest and could not be trusted to impartially manage the
Debtor. *Id.* at 24:17-25:17.

The Court's findings rested in large part on Ms. Liu's conduct concerning the alleged ASA.
For example:

- Although Ms. Liu claimed the parties had executed the ASA and were bound by its
  terms, *see id.* at 22:10-13, and despite the ASA's centrality to the Debtor's
  operations and finances, the Debtor did not disclose the agreement's existence in

10

the schedules it filed at the outset of the case, nor did Ms. Liu make any mention of the agreement in her Rule 1007 affidavit. *Id*. at 15:18-16:7.

- Although there was no evidence that KJD had ever paid the $1.5 million annual management fee required by the ASA, the Debtor did not list any accounts receivable balance owed by KJD on its schedules or in any of its monthly operating reports. *Id*. at 20:4-16.
- The Debtor's first mention of KJD in any of its bankruptcy filings was in the disclosure statement it filed with its initial plan of reorganization, nearly six months into the case—and that disclosure statement made no mention of any existing agreement between the Debtor and KJD. *Id*. at 16:8-17.
- Ms. Liu and the Debtor had no explanation for the "mind-boggling" inconsistencies between the historical and projected financials annexed to the Debtor's plan and the Debtor's financials as they would have been under the ASA. *Id*. at 16:18-18:14, 19:4-22:19.

In addition to the findings related to the ASA, the Court found that the following facts also supported the appointment of a chapter 11 trustee:

- Ms. Liu filed her own plan to compete with the Debtor's plan, and she did so with Dr. Doody using common counsel. *Id.* at 23:23-24:9. As the sole officer and director of the Debtor, it was a clear conflict of interest for her to file her own plan. Moreover, her filing jointly with Dr. Doody raised additional conflict issues. *Id*. at 23:23-24:22.
- Ms. Liu's transfer of all of the Debtor's employees to KJD post-petition without proper disclosure or court approval raised further issues. *Id*. at 26:24-28:7.
- The Debtor made numerous additional incorrect, incomplete and inconsistent filings in the case. For example, the Debtor failed to attach bank statements to its monthly operating reports or to provide proof of insurance or tax returns to the US Trustee, and it made inaccurate representations regarding its outstanding tax obligations. The Debtor also made unauthorized postpetition payments to professionals. *Id*. at 25:18-26:22.

On March 29, the Court entered an order directing the appointment of a chapter 11 trustee. The following week, the U.S. Trustee appointed Eric Huebscher, a respected financial advisor with particular expertise in the healthcare sector, as the Debtor's trustee. Dr. Hu, who had initially sought a confirmation hearing on May 16, then agreed to delay the hearing on confirmation of his plan to July 9 so that Mr. Huebscher would have time to familiarize himself with the Debtor's business affairs and to investigate the issues identified in the Court's March 29 bench ruling.

11

On July 3, Mr. Huebscher filed a letter with the Court summarizing the preliminary results of his investigation—a subject on which he testified at the confirmation hearing, as discussed below. His letter also included his statement, pursuant to section 1106(a)(5), explaining why he had chosen not to file a plan on behalf of the Debtor, but instead to support Dr. Hu's plan. As he later testified, he believed Dr. Hu's plan was "the only viable plan" on file that would "save the business and . . . the jobs and preserve the medical practice and have the doctor[s] be able to continue to provide medical services." Jul. 11 Tr. at 266:3-24.

    *iv.*   *Dr. Hu's Plan*

On March 18, 2024, six weeks after the February 2 expiration of the Debtor's exclusive solicitation period, Dr. Hu filed his plan of reorganization—the plan that, as amended, is now before the Court. The plan proposes to pay all allowed administrative and general unsecured claims in full on the effective date, to extinguish existing equity, and to issue new equity to a company created by Dr. Hu.[6] The plan is funded by Dr. Hu, who is required to provide sufficient funds by the effective date "or as soon as reasonably practicable thereafter" to pay all allowed claims in full. The Plan further requires Dr. Hu to provide the reorganized Debtor with $5 million in working capital. Dr. Hu filed a disclosure statement with his plan, even though solicitation of his plan is

---

[6] At least $1.09 million in claims are expected to be paid on or shortly after the effective date. This total is comprised of approximately $275,000 in prepetition general unsecured claims, $285,000 in postpetition vendor claims, and $535,000 in professional fees.

In addition, two disputed litigation claims, seeking about $1.85 million in damages, will pass through the bankruptcy and be paid in full to the extent eventually allowed. One of these disputed claims is an employment discrimination suit against the Debtor and Ms. Liu, which seeks $1 million in damages. The other disputed claim, by Ms. Liu, seeks about $855,000 in unpaid prepetition compensation. (Ms. Liu also asserts a $1.675 million contingent indemnification claim, but this claim is for obligations that either have already satisfied by the Debtor or, if not disallowed, will be satisfied by the reorganized Debtor pursuant to the Plan.) If these disputed claims were allowed in their full asserted amount of $1.85 million, Dr. Hu's plan would ultimately pay almost $3 million to creditors.

not required because all classes are presumed either to accept it under section 1126(f) or to reject it under section 1126(g).

In June, Dr. Hu filed an amended plan and a plan supplement. The amended plan was substantively similar to the plan filed in March, except that it incorporates comments from the US Trustee and the chapter 11 trustee and requires the $5 million in working capital to be paid on or as soon as reasonably practicable after the effective date. On July 7, Dr. Hu filed his second amended plan—the Plan—which incorporated a settlement among the Debtor, Holdings, Dr. Hu, Dr. Doody and KJD. Under the settlement, the Debtor would pay Dr. Doody $300,000, and the parties to the settlement would exchange mutual releases of all pre-effective date claims related to the Debtor, Holdings and the ASA. In addition, the settlement obligates Dr. Doody to assist the Debtor with its post-effective date transition from its partnership with KJD to a partnership with Dr. Thornton's medical practice.

   *v. Ms. Liu's Plan*

Ms. Liu objected to confirmation of Dr. Hu's plan and, on July 3—six days before the scheduled start of the confirmation hearing on his plan—filed her own competing plan of reorganization. In addition to paying all creditors in full, her plan would pay post-petition interest at a rate of 5.1% on all claims and would pay $1 million to the Debtor's equity holder. Funding for her plan would be provided by herself and Recharge Capital, a private investment firm, with Recharge and Ms. Liu being responsible for 70% and 30%, respectively, of the funding. The agreement between Recharge and Ms. Liu was memorialized in a series of letter agreements dated between July 1 and July 16, 2024. Until July 16, Recharge's financing was subject to several major contingencies, including most notably the completion of due diligence, as well as the successful transfer of Debtor's operational licenses to the new owner.

After issues were raised about the inappropriateness of Ms. Liu's potential involvement in the reorganized Debtor, she amended her plan on July 9 to limit her role, providing that she would only have an observer's role on the board of the reorganized Debtor's sole member, plus a possible marketing role at the reorganized Debtor at some future time. After the close of business on July 16—the evening before the last day of testimony on confirmation of Dr. Hu's plan—Ms. Liu filed an amended supplement to her July 9 plan, which included an amended agreement with Recharge that removed most of the contingencies to Recharge's financing commitment.

## C.    The Confirmation Hearing

The confirmation hearing on Dr. Hu's plan began on July 9, with argument on pretrial motions and other procedural issues. On July 11 and 17, the Court heard testimony from six witnesses: Ms. Hu, Mr. Huebscher, Ms. Liu, Dr. Hu, Dr. Doody and Lorin Gu, Recharge's CEO. The Court then heard closing arguments from counsel for Dr. Hu, Ms. Liu and the chapter 11 trustee, followed by post-trial briefing in late July and early August.

The testimony at the confirmation hearing addressed a host of topics relevant to confirmation of Dr. Hu's plan, including the Debtor's operations, finances and enterprise value. In addition, although Ms. Liu's plan had not (and has not) been noticed for confirmation, the Court allowed the parties to present evidence concerning that plan's terms and potential confirmability to the extent relevant to Ms. Liu's argument that her plan shows the Debtor's equity to have value.[7]

---

[7] At the outset of the confirmation hearing, Ms. Liu asked the Court to adjourn the hearing so that confirmation of her plan could be considered on a parallel track with Dr. Hu's. The Court declined to do so, and it reserved decision on whether to defer entry of an order confirming Dr. Hu's plan until after a hearing on confirmation of Ms. Liu's plan. For the reasons discussed in § III.C.ii.2 below, the Court now finds that Ms. Liu has not shown cause to defer entry of a confirmation order.

One particularly significant topic was the investigation by chapter 11 trustee, Mr. Huebscher, into Ms. Liu's management of the Debtor. Mr. Huebscher testified at length on this topic, and the Court found his testimony to be highly credible: careful, precise and often understated in his conclusions. His investigation confirmed that Ms. Liu grossly mismanaged the Debtor, and may also have committed fraud and defalcation:

- Under Ms. Liu's management, the Debtor had no books and records or accounting system. As a result, the Debtor could not generate financial statements internally. As far as Mr. Huebscher could tell, the Debtor did not even keep a record of its key vendors or the amounts it owed to vendors.
- Ms. Liu was the sole signatory on all of the Debtor's bank accounts, as well as most of KJD's bank accounts, and she commingled funds between these accounts and her own personal account.
- Ms. Liu was on the payroll of both GFG and KJD, and she wrote herself checks from both companies in amounts and at frequencies inconsistent with payment of a salary.
- Many employees are unwilling to remain with the Debtor if Ms. Liu were to continue to have a role with the company.

The ASA was also the subject of extensive testimony, by Ms. Liu and Dr. Doody in particular. For the first time, Ms. Liu presented the Court with a purported copy of the signed ASA. However, she and Dr. Doody strenuously disagreed over that document's authenticity. Ms. Liu testified that she gave Dr. Doody a final draft of the ASA at a conference in Philadelphia they both attended in the fall of 2019, and that Dr. Doody reviewed the ASA and emailed her a signed copy without marking it up or requesting any changes.

---

Ms. Liu also asked the Court to adjourn confirmation on the additional ground that the Debtor had only recently disclosed its settlement with Dr. Doody and KJD, leaving her insufficient time to take discovery on the merits of that settlement. The Court responded by authorizing Ms. Liu to take expedited discovery from Dr. Hu, provided she served her discovery requests promptly. Ms. Liu failed to do so, thereby waiving any argument that she did not have the opportunity to take discovery on the Doody settlement.

Dr. Doody's testimony was sharply at variance with Ms. Liu's. He testified that he never signed a version of the ASA under which KJD was obligated to pay a $1.5 million management fee to the Debtor. Instead, when Ms. Liu gave him the ASA for his signature at the 2019 Philadelphia conference, he responded by crossing out the section containing the management fee, signing the modified agreement, and handing it back to Ms. Liu. When presented at trial with the purported signed version of the ASA that contained the management fee provision, Dr. Doody testified he believed Ms. Liu had taken the signature page of the agreement he signed (with the management fee stricken) and substituted it for the unsigned signature page of the draft agreement she had given him (with the management fee included).

The Court finds that that Dr. Doody's testimony on this issue is much more credible than Ms. Liu's. Most notably, Ms. Liu's purported belief that the ASA was a binding agreement is impossible to square with many of the filings that Ms. Liu signed and filed on behalf of the Debtor in this bankruptcy—including financial projections that bore no relation to the amounts owed under the ASA, *see* Dkt. 34, Ex. B, and numerous schedules and reports that failed to note any amounts due from KJD, *see*, e.g., Dkt. 1 at 11 (Schedule A/B, listing no accounts receivable from KJD); Dkt. 25 at 2 (June monthly operating report, listing no accounts receivable from KJD); Dkt. 34 at 28 (liquidation analysis annexed to Debtor's disclosure statement, listing no accounts receivable). At the confirmation hearing, Ms. Liu did not even try to explain this enormous discrepancy.

Moreover, her testimony that Dr. Doody signed and emailed her an unmodified version of her draft of the ASA raises the obvious question: Why didn't she offer this supposed email, with the signed ASA attached, into evidence at the confirmation hearing? She testified that Dr. Doody sent this email to her work email, to which she continued to have access until her termination in

16

June 2024, months after the Court had expressed serious concerns about whether a fully executed ASA existed. She further testified that she forwarded the fully executed ASA to her attorneys in the fall of 2019. The notion that neither she nor her attorneys thought to preserve and offer into evidence this crucial document—which, if it existed, would provide strong contemporaneous evidence of the ASA's validity—strains credulity. On this issue, too, Ms. Liu made little effort to address the questions raised by her version of events, and in the Court's view, her cursory attempts to do so were stilted and evasive.

### III.    DISCUSSION

### A.    Approval of the Disclosure Statement is Not Necessary.

Dr. Hu filed a disclosure statement with the first version of the Plan but subsequently withdrew his request for approval of the disclosure statement. A disclosure statement is not required for the Plan, because no classes are entitled to vote; all classes either are unimpaired and deemed to accept under 1126(f) or are receiving nothing and deemed to reject under 1126(g). *See, e.g., In re Amster Yard Assocs.*, 214 B.R. 122, 124 n. 5 (Bankr. S.D.N.Y. 1997) ("If all classes are unimpaired and no solicitation is required, the court does not have to approve a disclosure statement prior to confirmation, if ever."); *In re Feldman*, 53 B.R. 355, 357–58 (Bankr. S.D.N.Y. 1985) ("no disclosure statement is required for [unimpaired] classes since a disclosure statement is required only for the purpose of soliciting an acceptance or rejection of the plan."); *see also In re Colony Properties Int'l, LLC*, No. 10-02937-PB11, 2011 WL 4443319, at *2 (Bankr. S.D. Cal. Sept. 19, 2011) (holding "the lack of disclosure statement in this case is not a bar to confirmation" where "general unsecured creditors . . . are presumed to have accepted the plan. . . . [and] the equity holders . . . are deemed to have rejected.").

17

**B.      The Plan Satisfies All Provisions of Section 1129(a) Except Section 1129(a)(8).**

To confirm a plan, the Debtor must prove that the plan satisfies each of the requirements
of section 1129(a) other than section 1129(a)(8). Here, the Plan does not satisfy section 1129(a)(8)
because the interest holders are deemed to reject under 1126(g). However, the Court finds that the
Plan satisfies each of the remaining requirements of section 1129.[8]

> ### i.      *Section 1129(a)(1)*

Section 1129(a)(1) provides that the plan must comply with the applicable provisions of
the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(1). "In determining whether a plan complies with
section 1129(a)(1), reference must be made to sections 1122 and 1123 with respect to the
classification of claims and the contents of a plan of reorganization." *In re Texaco Inc.*, 84 B.R.
893, 905 (Bankr. S.D.N.Y. 1988); *see also* S. Rep. 95-989, 126 (1978).

> #### 1.      Section 1122

Section 1122 provides that the claims or interests within a given class must be
"substantially similar" to one another. Here, there are only two classes. Class 1 contains creditors,
all of whom are unsecured and unimpaired. Class 2 contains interests and has only one member—
Holdings. Therefore, the Plan satisfies section 1122.

> #### 2.      Section 1123(a)

Section 1123(a) details certain requirements for a chapter 11 plan, including that it (i)
designate classes of claims and interests, *see* 11 U.S.C. § 1123(a)(1); (ii) specify any unimpaired
classes, *see id.* § 1123(a)(2); (iii) specify the treatment of impaired classes, *see id.* § 1123(a)(3);

---

[8] Sections 1129(a)(6), (10), (13), (14), (15), and (16) do not apply to the Plan, and this decision therefore does not
discuss those subsections.

(iv) provide for equality of treatment within each class, *see id.* § 1123(a)(4); (v) provide adequate

means for the plan's implementation, *see id.* § 1123(a)(5); and (vi) contain only provisions

consistent with the interests of the creditors and equity security holders and with public policy with

respect to the manner of selection of directors and officers of the reorganized company*, see id.* §

1123(a)(7).[9]

    The Plan satisfies these requirements. Other than for section 1123(a)(4), this conclusion

requires only brief discussion:

- Plan §§ 2.2 and 2.3 designate classes of claims and interests and specify that Class 1 is unimpaired, whereas Class 2 is impaired and receives no distribution. Therefore, the Plan satisfies Section 1123(a)(1)-(3).

- Plan § 5 provides adequate means for implementation of the Plan, including cancelation of equity interests and creation of an acquisition vehicle to own the newly issued membership interests in exchange for Dr. Hu's financial contributions. Therefore, the Plan satisfies Section 1123(a)(5).

- The Debtor's Amended Operating Agreement provides that the reorganized Debtor's sole member, managed solely by Ms. Hu, will have sole authority to manage the reorganized Debtor and may designate officers as needed. *See* Plan Supplement Ex. A § 5; Ex. B § 1.1, 3.1. Granting the power to appoint officers of the Debtor to Ms. Hu is in the interests of creditors, equity, and public policy because she has been involved with the Debtor's business since 2022 and has worked with the chapter 11 trustee over the past several months to prepare for the transition of the business. Therefore, the plan satisfies Section 1123(a)(7).

    The Plan also satisfies section 1123(a)(4)'s requirement of equal treatment within a class.

Plan § 2.3 provides that all members of Class 1 (creditors) receive the same treatment: payment in

full on the effective date or on the date the claim becomes allowed. Class 2 (interests) has only one

member, Holdings, and therefore the Plan on its face satisfies section 1123(a)(4) with respect to

---

[9] Section 1123(a)(6) does not apply because the Debtor is not a corporation, and § 1123(a)(8) does not apply because the Debtor is not an individual.

this class. Ms. Liu contends, however, that the Plan provides disparate treatment to the ultimate owners of the Debtor's equity—Dr. Hu, Dr. Doody and herself (who respectively own 70%, 15% and 15% of Holdings' LLC interests)—because it proposes to give equity to Dr. Hu, $300,000 to Dr. Doody, and nothing to Ms. Liu.[10] *See* Dkt. 146 ¶¶ 5-10 (citing *In re 4C Solutions, Inc.*, 302 B.R. 592, 597 (Bankr. C.D. Ill. 2003) (treating member of debtor's sole equity holder as holder of "interest" in debtor for absolute priority rule purposes)).

The Court is not persuaded that it is proper to look through corporate form and treat Holdings' members as holders of interests in the Debtor for purposes of section 1123(a)(4). But the Court need not reach this legal issue, because the Court finds, based on the Plan's terms and the testimony at the confirmation hearing, that neither Dr. Hu nor Dr. Doody is receiving anything under the Plan on account of his indirect ownership of the Debtor. The Plan attributes no value to the Debtor's equity. Plan § 2.3.2. It distributes the reorganized Debtor's equity to Dr. Hu's designee not on account of Dr. Hu's indirect ownership interest, but instead in exchange for his commitment to pay all allowed claims in full and to provide the reorganized Debtor with an additional $5 million of working capital. *See* Plan §§ 4.1, 4.6.[11] As for Dr. Doody, the $300,000

---

[10] Ms. Liu bases her disparate treatment objection on § 1129(b)'s prohibition on "unfair discrimination." However, that prohibition applies only to discrimination between classes, not to discrimination among the members of a particular class. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 62 (Bankr. S.D.N.Y. 1990) ("a plan does not 'discriminate unfairly' with respect to a dissenting class if the plan protects the legal rights of such class in a manner consistent with the treatment of other classes whose legal rights are interrelated with the rights of the dissenting class."). Because the Plan has only one equity class and therefore cannot be said to discriminate among equity classes, the Court will treat Ms. Liu's objection as asserting a violation of § 1123(a)(4)

[11] To be sure, the term "on account of," as used in the Bankruptcy Code, has a broader meaning than simply "in exchange for." *See 203 N. LaSalle*, 526 U.S. at 449-50. It can mean also "because of," *id.* at 450-51, such as when an insider uses the control afforded by his equity ownership to propose a debtor plan that gives him the reorganized debtor's stock. *See id.* at 454. But this broader meaning has no application here: Although Dr. Hu is a technically an insider of the Debtor, neither he nor any other insider has controlled the Debtor since a chapter 11 trustee was appointed earlier this year. Moreover, Dr. Hu's plan is not a Debtor plan, but rather a plan of his own, filed after the Debtor's exclusive period to propose a plan expired.

he will receive under the Plan is not on account of his indirect equity interest, but instead pursuant to the settlement among him, KJD, the Debtor, Holdings and Dr. Hu. *See* Plan § 2.3.2.

3. Section 1123(b)

Section 1123(b) sets forth a variety of optional terms that a plan may contain, including provision for "the settlement or adjustment of any claim or interest belonging to the debtor or the estate." 11 U.S.C. § 1123(b)(3). This right to settle debtor claims extends to any plan proponent, not just the debtor-in-possession or trustee. *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 947 (Bankr. S.D.N.Y. 1994). Settlements under a plan are governed by the same standards as those under Bankruptcy Rule 9019, which at bottom require the settlement to be "fair and equitable, and in the best interests of the estate." *In re Ditech Holding Corp.*, 606 B.R. 544, 622-23 (Bankr. S.D.N.Y. 2019). In determining whether to approve a settlement, the court need not "conduct a mini-trial on the merits of the settlement or otherwise resolve disputed issues of law or fact underlying the settlement," but need merely "'canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness.'" *Id.* (quoting *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Motorola v. Comm. of Unsecured*

---

It is also worth noting that Dr. Hu's plan is not a "new value" plan. The new value doctrine is an exception to the absolute priority rule, under which "the objection of an impaired senior class does not bar junior claim holders from receiving or retaining property interests in the debtor after reorganization, if they contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise." *Id.* at 442. The Plan does not violate the absolute priority rule, because creditors' claims are paid in full, in cash, on the effective date. *See In re LightSquared, Inc.*, 534 B.R. 522, 536-37 (S.D.N.Y. 2015) (holding that the new value exception does not apply to a plan where "junior creditors [do not] 'leap over' more senior creditors whose claims are not paid in full.").

*Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (elaborating on the factors a court should consider).[12]

As noted, the Plan includes a settlement among the Debtor, Dr. Doody, KJD, Holdings and Dr. Hu, under which (a) the Debtor will make a $300,000 cash payment to Dr. Doody, (b) Dr. Doody will assist the Debtor with its post-effective date transition from KJD to a partnership with another medical practice, and (c) all parties to the settlement will exchange mutual releases of pre-effective date claims related to the Debtor, Holdings and the ASA. Ms. Liu objects to the settlement principally on the ground that it releases the Debtor's claims against KJD and Dr. Doody for insufficient consideration.

Based on the record of the confirmation hearing, the Court finds that Ms. Liu's objection lacks merit and that the settlement is fair and reasonable. The settlement provides substantial value to the Debtor, by securing Dr. Doody's assistance with the reorganized Debtor's transition to a partnership with a new medical practice. As both Dr. Hu and Dr. Doody testified, the Debtor will need Dr. Doody's help on a number of fronts, including insurance, permitting and licensing matters. For example, Dr. Doody has agreed to allow the Debtor and Dr. Thornton to continue to use KJD's insurance and permits during the transition; without this accommodation, the Debtor might be forced to cease operations for months while Dr. Thornton's PLLC obtains the necessary

---

[12] The specific factors identified by the Second Circuit in *Iridium* are "(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining." 478 F.3d at 462 (citations omitted).

insurance and accreditations. Dr. Doody has also agreed to direct KJD to help the reorganized Debtor collect on outstanding insurance claims.

Ms. Liu does not appear to dispute that Dr. Doody's help with the transition will be worth at least the $300,000 the Debtor has agreed to pay him. Instead, she contends that any net benefit to the reorganized Debtor is dwarfed by the value of the claims against KJD that the settlement releases. In particular, she argues, KJD has never paid the Debtor the $1.5 million annual management fee required by the ASA, and as a result, it owes the Debtor more than $9 million.

This objection fails for several reasons. Most important, any claims against KJD or Dr. Doody under the ASA appear to lack merit. As discussed above, Dr. Doody gave credible testimony that the parties never finalized or signed the ASA, and Ms. Liu's testimony to the contrary was far from credible.

Moreover, even if Ms. Liu could somehow show that the version of the ASA she presented to the Court is an enforceable contract, the Debtor still would not have a valid claim against KJD for breach of that agreement. It is undisputed that the Debtor has failed to perform numerous material obligations under the ASA. For example, the ASA required the Debtor to prepare "comprehensive and detailed annual capital and operating budgets," as well as "monthly and year-to-date financial reports, prepared consistent with generally accepted accounting principles," of revenues, expenses and accounts receivable, *see* ASA §§ 4.2, 4.8, but as Mr. Huebscher testified, the Debtor-KJD enterprise had no books and records and no accounting system. The ASA also required the Debtor to provide clerical, administrative, and office support services to KJD, an obligation on which the Debtor defaulted after Ms. Liu transferred all employees to KJD. Under New York law, a party that has materially breached a contract may not sue the other party for

breach. *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006).

In addition, it is entirely unclear whether any judgment the Debtor might obtain against KJD would have any value. Ms. Liu repeatedly testified that "[KJD] never [had] enough money to pay" the management fee. In addition, Mr. Huebscher testified that KJD has been unable to obtain financing, even after he terminated Ms. Liu and took over the Debtor's operations. These facts suggest that any judgment against KJD is likely to be unrecoverable, and the remote prospect of any recovery in a lawsuit against KJD would almost certainly be exceeded by the cost of the litigation, which could be considerable. Finally, the chapter 11 trustee—a key party in interest—supports the settlement, and no creditor other than Ms. Liu has objected to it.

For all of these reasons, the Court finds that the deal the Debtor has struck—to pay $300,000, exchange mutual releases, and obtain Dr. Doody's assistance with the Debtor's upcoming transition—is reasonable and in the estate's best interests.

>    ii.    *Section 1129(a)(2)*

Section 1129(a)(2) requires the Court to find that the "proponent of the plan complies with the applicable provisions of this title." This provision incorporates section 1121, which addresses who may file a plan of reorganization. Section 1121(c) provides, in pertinent part, that after the expiration of the Debtor's exclusivity period, "[a]ny party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan." 11 U.S.C. § 1121(c).

Here, exclusivity has expired, and therefore any creditor or other party in interest may file a plan. Dr. Hu filed a contingent, unliquidated claim against the Debtor in June 2024 for any potential litigation claims he may have against the Debtor arising out of Ms. Liu's misconduct.

24

*See* Claim No. 10. No party has objected to his claim, and it is therefore "deemed allowed." 11

U.S.C. § 502. Consequently, Dr. Hu is a creditor with standing to file a plan.

   *iii. Section 1129(a)(3)*

  Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means

forbidden by law." 11 U.S.C. § 1129(a)(3). The "good faith" standard requires a showing that the

plan "was proposed with honesty and good intentions and with a basis for expecting that a

reorganization can be effected." *Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re*

*Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162, 174 (2d Cir.2008) (quoting *In re Koelbl*,

751 F.2d 137, 139 (2d Cir.1984)). It "must be viewed in light of the totality of the circumstances

surrounding the establishment of a chapter 11 plan...." *In re Leslie Fay Cos. Inc.*, 207 B.R. 764,

781 (Bankr.S.D.N.Y.1997) (citations omitted). A plan is deemed filed in good faith "when the plan

has been proposed for the purpose of reorganizing the debtor, preserving the value of the

bankruptcy estate, and delivering that value to creditors." *In re Genco Shipping & Trading Ltd.*,

513 B.R. 233, 261 (Bankr. S.D.N.Y. 2014). Good faith has been found to be lacking when the plan

was proposed with ulterior motives. *Koelbl*, 751 F.2d at 139 (citations omitted).

  The Plan readily satisfies this standard. Ms. Liu does not seriously dispute that Dr. Hu filed

his plan "for the purpose of reorganizing the debtor, preserving the value of the bankruptcy estate,

and delivering that value to creditors." *Genco Shipping*, 513 B.R. at 261. Nor could she. At the

outset of the bankruptcy, Dr. Hu made three offers to serve as a stalking horse bidder in an auction

of the Debtor's assets. Ms. Liu not only rebuffed those offers but also committed gross

mismanagement that led to the appointment of a chapter 11 trustee. Dr. Hu has now proposed a

plan that will pay all creditors in full and that will enable the Debtor to continue operating without

any disruption to patient care. If anyone has acted in bad faith in this case, it is Ms. Liu, not Dr. Hu.

Ms. Liu contends that Dr. Hu has "proposed [his plan] . . . by . . . means forbidden by law," in violation of section 1129(a)(3), because the Plan will extinguish her indirect ownership of the Debtor for no consideration, allegedly in violation of the Debtor's governing documents and applicable state law. Specifically, she argues, the Plan violates (i) provisions of the Holdings Operating Agreement, as well as Delaware's "entire fairness" doctrine, that require Holdings to pay fair market value for Ms. Liu's equity interests, and (ii) a non-compete provision in the Holdings Operating Agreement that prohibits Dr. Hu from investing in a competing business.

This objection lacks merit for two independent reasons. *First*, as courts in this district have uniformly held, section 1129(a)(3) applies only to "the process of plan development," and not to "the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (citation omitted). "[T]here is no requirement imposed by § 1129(a) that the contents of a plan comply in all respects with the provisions of all nonbankruptcy laws and regulations." *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 59–60 (Bankr. S.D.N.Y. 1990); *see also In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *33 (Bankr. S.D.N.Y. June 18, 2022) ("The Court need not and will not attempt to resolve [whether the Plan complies with Chilean law] in considering whether the Plan satisfies section 1129(a)(3)."); *In re Charter Commc'ns*, 419 B.R. 221, 261 (Bankr. S.D.N.Y. 2009) (the possibility that a plan may violate the "entire fairness" doctrine does not preclude confirmation under section 1129(a)(3)).

This conclusion is compelled by the plain terms of section 1129(a)—particularly sections 1129(a)(3) and (a)(1)—as the Ninth Circuit Court of Appeals explained in a cogent recent decision, *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031 (9th Cir. 2019). The text of section

26

1129(a)(3) speaks only to the process by which the plan was proposed, requiring that it have been "*proposed* in good faith and not by any means forbidden by law" (emphasis added); the section says nothing about the substance of the plan's terms. *See Garvin*, 922 F.3d at 1035. In contrast, section 1129(a)(1) expressly requires that "the plan complies with the applicable provisions of this title," i.e., the Bankruptcy Code. In addition to misreading section 1129(a)(3)'s own terms, Ms. Liu's construction would render section 1129(a)(1) redundant: "If § 1129(a)(3) is read to mean that the plan must comply with all applicable law, there would be no need for a separate requirement that the plan comply with the provisions of the Bankruptcy Code specifically." *Garvin*, 922 F.3d at 1035.

*Second*, even if the Court were to disregard section 1129(a)'s plain terms and to follow the few courts that have construed that provision to require compliance with all applicable state and federal laws,[13] Ms. Liu's objection would still lack merit. Ms. Liu has failed to show that the Plan violates either the Holdings Operating Agreement or Delaware law:

- Ms. Liu's contention that the Plan fails to pay her the fair market value of her Holdings shares, in violation of both the Holdings Operating Agreement and Delaware's entire fairness doctrine, fails because, as discussed in § III.C.ii below, she has failed to demonstrate that Holding's equity interest in the Debtor has any value. Because Holdings has no assets other than that worthless equity interest, it follows that her Holdings shares are also worthless.

- Ms. Liu's contention that the Plan will breach the non-compete provision of Holdings' Operating Agreement also fails. Dr. Hu has made clear that he intends to dissolve Holdings shortly after the effective date. Under Holdings' Operating Agreement, he has the power to do so by virtue of his majority vote on Holdings' board, subject to Dr. Doody's consent, which appears to be forthcoming. *See*

---

[13] *See In re Walden Palms Condo. Ass'n, Inc.*, 625 B.R. 543, 549-50 (Bankr. M.D. Fla. 2020) (denying confirmation where plan violated Florida law because "Section 1129(a)(3) specifically requires the confirmed plan to comply with all existing laws."); *In re Arm Ventures*, 564 B.R. 77, 86 (Bankr. S.D. Fla. 2017) ("the Amended Plan is based on an enterprise illegal under Federal law, and therefore one that I cannot confirm because the Debtor cannot satisfy the requirements of 11 U.S.C. § 1129(a)(3)").

> Operating Agreement §§ 5.2, 9.1; Plan § 4.13. Once Holdings has been dissolved, its non-compete provision will have no further force and effect.

For all of these reasons, the Plan satisfies section 1129(a)(3).

> iv.    *Section 1129(a)(4)*

Section 1129(a)(4) requires that any payment to be made by the proponent, the debtor, or asset purchaser for services or expenses in connection with the case or the plan "has been approved by, or is subject to the approval of, the court as reasonable." Section 2.1.4 of the Plan provides for such approval, and therefore section 1129(a)(4) is satisfied.

> v.    *Section 1129(a)(5)*

Section 1129(a)(5)(A)(i) and (B) require, in relevant part, that the plan disclose the identity and affiliations of (x) any proposed director, officer, or voting trustee of the debtor or its successor under the plan; and (y) any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for that insider. Exhibits A, B, and F disclose the identity and affiliations of the manager of the Debtor (The Mount Baekdu Health Service LLC) and the manager and owners of the new holding company (Ms. Hu as manager and owner, and Ms. Valeria Kulynych, and Mr. J. Kendall Smalls as owners). Ms. Hu, as a "relative of a . . . person in control of the debtor" is an insider, *see* 11 U.S.C. § 101(31)(B)(vi), but since she is not employed directly by the Debtor, the plan need not disclose her compensation.

Section 1129(a)(5)(A)(ii) provides that the appointment to or continuation of an individual in the role of director, officer, or voting trustee of the Debtor or its successor must be "consistent with the interests of creditors and equity security holders and with public policy." Ms. Liu asserts that the continued involvement of Dr. Hu and Yihan Hu with the reorganized Debtor is contrary to the interests of creditors and equity holders because the Hus were once sanctioned for failure for discovery-related misconduct in a lawsuit wholly unrelated to the Debtor. But a single instance

28

of discovery misconduct in an unrelated case is entitled to little, if any, weight. Moreover, as discussed above, the record demonstrates that Dr. Hu's involvement has consistently served the Debtor's interests; indeed, without Dr. Hu's continuing financial support, the Debtor would not have been able to survive. As for Ms. Hu, the Court is persuaded by her testimony that she, too, is committed to seeing the Debtor succeed. For these reasons, as well as the fact that no-one other than Ms. Liu has objected to the Hus' continued involvement, the Court finds that the Plan satisfies section 1129(a)(5)(A)(ii).

    *vi. Section 1129(a)(7)*

   Section 1129(a)(7) sets forth the so-called "best interests" test, which requires that each holder of a claim or interest in an impaired class has either accepted the plan or will "receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992) (internal citation omitted).

   Here, the only impaired class is the dissenting equity class, which is receiving no distribution and has not accepted the Plan. The best interests test is nevertheless satisfied, because it is undisputed that, in a liquidation, holders of the Debtor's equity interests would receive nothing. Indeed, the liquidation analysis that the Debtor, under Ms. Liu's management, annexed to its prior plan itself shows that distributions in a liquidation would fall far short of the amounts owed to creditors. *See* Dkt. 34 at 28 (Liquidation Analysis in Debtor's Disclosure Statement, signed by Ms. Liu).

vii.    *Section 1129(a)(9)*

Section 1129(a)(9) prescribes the statutory minimum treatment that a plan must provide to holders of certain priority claims, absent the holder's agreement to lesser treatment. In accordance with subsections (A), (B) and (C) of this section, Section 2.1 of the Plan provides that each holder of an Allowed Administrative Claim, Allowed Priority Tax Claim and Allowed Non-Tax Priority Claim will be paid in full in Cash on the earlier of the date that is (a) on or as soon as reasonably practicable after the Effective Date if such Claim is Allowed as of the Effective Date or (b) on or as soon as reasonably practicable after the date such Claim is Allowed, if not Allowed as of the Effective Date. Similarly, each Allowed Professional Fee Claim will be paid in full promptly after entry of a Final Order approving the application for such Professional Fee Claim. Accordingly, the Plan satisfies section 1129(a)(9).

viii.    *Section 1129(a)(11)*

Section 1129(a)(11) requires that the plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan." Courts have adopted a relaxed interpretation of this so-called "feasibility" standard, requiring only a finding that "the plan offers a reasonable assurance of success." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

Ms. Liu challenges the Plan's feasibility on the ground that Dr. Hu has failed to prove he has sufficient funds in the United States to make all plan payments, including the approximately $1.4 million in funding that he will need to provide up front to pay all claims allowed by the effective date ($1.1 million), plus the $300,000 settlement payment to Dr. Doody. She points out that, at the start of the confirmation hearing, the Hu family's only bank account in the United States, held by his daughter, had a balance of less than $1 million. In response, Dr. Hu testified

30

that he has $240 million in liquid assets in China, $55 million of which is held in a Chinese company 100% owned by him, his wife and his daughter for the purpose of funding the reorganized Debtor. Although PRC regulations can complicate the process of moving funds out of China, Dr. Hu testified that, as soon as a confirmation order has been entered, he plans to apply to the PRC Ministry of Commerce for approval of his overseas direct investment in the Debtor, which he expects will be granted within 5 to 20 business days.

To eliminate any doubt as to Dr. Hu's ability to make his initial $1.4 million contribution, Dr. Hu's counsel agreed to include in the confirmation order an unwaivable condition that, by the effective date, Ms. Hu's U.S. bank account will have a balance of at least $2.5 million—far more than will be needed to make the payments due at that time. As for the $5 million in working capital that the Plan requires Dr. Hu to contribute after the effective date, the Court is satisfied by Dr. Hu's testimony, as well as his long history of funding the Debtor, that he has both the ability and the motivation to continue doing so going forward. In addition, because the reorganized Debtor will have no funded debt, even a delay in Dr. Hu's provision of his promised working capital would not necessarily pose much risk of plan failure. The Court therefore finds that Dr. Hu has amply satisfied the requirement that the Plan have "a reasonable assurance of success." *Kane*, 843 F.2d at 649.

### C.    The Plan Satisfies Section 1129(b) With Respect to the Non-Consenting Equity Class.

Although the Plan satisfies all of section 1129(a)'s other requirements, it does not satisfy section 1129(a)(8) with respect to Class 2—equity—because that class is receiving nothing and therefore is deemed to reject the Plan. The Plan therefore can only be confirmed if it satisfies the so-called cram-down provisions of section 1129(b)—namely, that "the plan does not discriminate unfairly, and is fair and equitable," with respect to the equity class. 11 U.S.C. § 1129(b)(1).

31

Ms. Liu argues the Plan's treatment of equity does not satisfy the fair and equitable test because it extinguishes the allegedly valuable interest of Holdings for no consideration.[14] The equity's value is demonstrated, she argues, by her competing plan, which would pay $1 million to Holdings on account of its equity interest. Dr. Hu responds that her contention lacks merit as a matter of both law and fact: legally, because no class junior to the equity is receiving anything under the Plan and therefore the fair and equitable test is satisfied as a matter of law; and factually, because the Debtor's equity has no value.

For the reasons discussed below, the Court rejects Dr. Hu's legal argument, concluding that the fair and equitable standard requires a determination whether the Debtor's equity has value. However, the Court rules for Dr. Hu on this factual issue, finding that Ms. Liu has failed to show the Debtor's equity has value. Consequently, the Plan satisfies the fair and equitable requirement.

>    i.    *Satisfaction of the Absolute Priority Rule Does Not By Itself Satisfy Section 1129(b)'s "Fair and Equitable" Requirement*

Dr. Hu asks the Court to adopt a *per se* rule that where, as here, there is no class junior to an objecting class of equity interests, the plan satisfies the fair and equitable requirement as a matter of law, even if the record indicates that the equity has value. *See* Dkt. 141 ¶ 16 (citing *In re Claar Cellars LLC*, 623 B.R. 578 (Bankr. E.D. Wash. 2021)). He bases this argument on section 1129(b)(2), which provides in relevant part:

> [T]he condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> . . .

---

[14] Ms. Liu also contends that the Plan contravenes § 1129(b)(1)'s unfair discrimination requirement by allegedly providing disparate treatment to members of the equity class. However, as noted in § III.B.i.2 above, this requirement applies only to discrimination between classes, not to discrimination among the members of a given class. Because the Plan has only one equity class (and in any event, that class has only one member), this requirement is inapplicable.

32

(C) With respect to a class of interests—

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C).[15]

Dr. Hu argues that, when—as here—the debtor has only a single class of equity, section 1129(b)(2)(C) by its terms compels the conclusion that such a plan is always fair and equitable. As he notes, this section expressly requires a showing *either* that equity has been paid fair value (subsection (i)) *or* that no junior class has received a distribution (subsection (ii)). When the debtor has only a single equity class, subsection (ii) is automatically satisfied: no junior equity class exists, and therefore no such class can receive a distribution. *Ahuja v. LightSquared Inc.*, 644 F. App'x 24, 29 (2d Cir. 2016). To require a plan that satisfies subsection (ii) also to satisfy subsection (i), he contends, would ignore Congress' choice of the word "or" to link these two subsections.

Dr. Hu is clearly correct that, to satisfy the absolute priority rule—that is, the requirements of section 1129(b)(2)(C)—a plan need only satisfy either subsection (i) or (ii), not both of those subsections. As the Third Circuit has observed, "[t]he use of the word 'or' in [section 1129(b)(2)(A)] operates to provide alternatives—a debtor may proceed under subsection (i), (ii),

---

[15] The rule set forth in § 1129(b)(2)—that "a reorganization plan may not give 'property' to the holders of any junior claims or interests 'on account of' those claims or interests, unless all classes of senior claims either receive the full value of their claims or give their consent"—is commonly referred to as the "absolute priority rule." *In re DBSD N. Am., Inc.*, 634 F.3d 79, 88 (2d Cir. 2011).

or (iii), and need not satisfy more than one subsection." *In re Philadelphia Newspapers, LLC*, 599

F.3d 298, 305 (3d Cir.2010); *see also In re Meruelo Maddux Properties, Inc*., No. 2:11-CV-5458

SVM, 2013 WL 4045922, at *5 (C.D. Cal. Aug. 7, 2013) ("By mandating that [equity] receive the

"fair market value" of their stock [where no junior class was receiving a distribution], the

Bankruptcy Court effectively transformed the word 'or' in Section 1129(b)(2)(C) into an 'and,' an

interpretation at odds with the plain language of the statute."), *aff'd*, 637 F. App'x 1012 (9th Cir.

2016).

However, the absolute priority rule is only part of the fair and equitable standard; it is not

the entirety of that standard. Section 1129(b)(2)'s opening clause makes this clear, stating that the

fair and equitable standard "*includes*" the specific requirements set forth in the balance of the

section. 11 U.S.C. § 1129(b)(2) (emphasis added); *see also id*. § 102(3) ("In this title . . . 'includes'

and 'including' are not limiting."); *In re DBSD N. Am., Inc.*, 634 F.3d 79, 88 (2d Cir. 2011) ("The

Code does not define the full extent of 'fair and equitable,' but it includes a form of the absolute

priority rule as a prerequisite."); *Matter of D & F Const. Inc.*, 865 F.2d 673, 675 (5th Cir. 1989)

(the requirements of section 1129(b)(2) are not exhaustive but merely describe the minimum

standard that a plan must meet to satisfy the fair and equitable requirement).

The question, then, is what requirements the fair and equitable standard adds to those

imposed by the absolute priority rule. In particular, does a cramdown plan that extinguishes

valuable equity for no consideration potentially violate the fair and equitable test, even if the

absolute priority rule is satisfied? The Court concludes that the language and legislative history of

section 1192(b) compel an affirmative answer to this question.

To start with the statute's text, Congress has chosen a term, "fair and equitable," that

appears to be self-defining—that is, to have an ordinary, plain English meaning. Moreover, as just

34

noted, the Bankruptcy Code specifically defines a portion of this term's meaning (the absolute

priority rule), but not all of it. The clear implication is that Congress intended the courts to apply

this term broadly and flexibly, in accordance with its ordinary meaning.

The legislative history supports this conclusion. In particular, the House Report invites

courts to read into this statutory term any requirements "found . . . to be fundamental to 'fair and

equitable' treatment of a dissenting class" in any given case:

> Although many of the factors interpreting "fair and equitable" are specified in
> paragraph (2) [of § 1129(b)], others, which were explicated in the description of
> section 1129(b) in the House report,[16] were omitted from the House amendment to
> avoid statutory complexity and because *they would undoubtedly be found by a court
> to be fundamental to "fair and equitable" treatment of a dissenting class. For
> example, a dissenting class should be assured that no senior class receives more
> than 100 percent of the amount of its claims.* While that requirement was explicitly
> included in the House bill, the deletion is intended to be one of style and not one of
> substance.

H.R. Rep. 95-595 at 549 (1978) (emphasis added). Courts have followed this statement of

Congressional intent, holding that "[a] plan must be fair and equitable in a broad sense, as well as

in the particular manner specified in 11 U.S.C. § 1129(b)(2)." *In re Bryson Properties, XVIII*, 961

F.2d 496, 505 (4th Cir. 1992); *see also D&F Const.*, 865 F.2d at 675 (section 1129(b)(2) "should

not be interpreted as requiring that every plan not prohibited be approved"; instead, courts "must

consider the entire plan in the context of the rights of the creditors under state law and the particular

facts and circumstances when determining whether a plan is 'fair and equitable.'").[17]

---

[16] The Court has been unable to locate any provision of the House Report that describes any specific factors to be considered in a fair and equitable analysis other than the one example given in this paragraph—namely, that no senior class may receive more than the full value of its claims.

[17] The case law addressing cramdown of equity is sparse, and the Court is unaware of any decision addressing the specific issue before the Court, namely, whether a cramdown plan may extinguish valuable equity for no consideration simply because no junior class exists. Nevertheless, courts that have addressed an analogous issue—whether a plan may cram down equity while paying more than 100 cents on the dollar to creditors—have uniformly required the plan

A plan that extinguishes valuable equity for no consideration over the equity class's objection is anything but fair and equitable, in the ordinary sense of those words. Such a result is no fairer than the result specifically proscribed by the House Report, namely, paying creditors more than 100 cents on the dollar. Consequently, such a plan cannot be deemed to satisfy the fair and equitable standard.

Of course, this reading of section 1129(b)(1) must be squared with the more specific provisions of sections 1129(b)(2)(C)(i) and (ii)—and the tension between those two sets of provisions is undeniable. Too broad an application of the fair and equitable standard could have the effect of nullifying section 1129(b)(2)(C)'s provisions, in contravention of basic statutory construction principles. Specifically, if the fair and equitable standard required the proponent of every plan that extinguishes equity to prove that the equity has no value, this would be tantamount to requiring the plan to comply with subsection (i)'s fair value requirement regardless of whether the plan satisfied subsection (ii), thereby overriding section 1129(b)(2)(C)'s specific directive that

---

proponent to show that no such overpayment was involved, even when the plan satisfied § 1129(b)(2)(C)(ii). For example, in the *LightSquared* bankruptcy, Judge Chapman confirmed a plan that crammed down the debtor's single equity class over the objection of a large equity holder. *See In re Lightsquared Inc.*, Case No. 12-12080-scc [Dkt. 2285] at 100:6 (Bankr. S.D.N.Y. Mar. 27, 2015), *aff'd*, 534 B.R. 522 (S.D.N.Y. 2015), *aff'd sub nom Ahuja v. LightSquared Inc. (In re LightSquared, Inc.)*, 644 F. App'x 24 (2d Cir. 2016). Even though § 1129(b)(2)(C)(ii) was satisfied by virtue of the absence of any junior class, Judge Chapman heard extensive testimony and issued detailed factual findings to support her conclusion that the plan did not pay creditors more than 100 cents on the dollar. *See Lightsquared,* Dkt. 2285 at 115:11-116:6, 128:6-131:17; *see also Chemtura*, 439 B.R. at 592-93 (Bankr. S.D.N.Y. 2010) (holding, after four-day confirmation hearing that "devoted so much time to the Debtor's value," that "the Equity Committee's 'fair and equitable' objections here lack merit" because "Debtor's [total enterprise value] doesn't exceed the [enterprise value] on which the Settlement [under the Plan] is based and . . . Creditors . . . will here not be overpaid."); *Genco Shipping*, 513 B.R. at 242-61 (holding, after analyzing four different valuation methods for the debtor's enterprise value, that "[debtor] is insolvent and, therefore, the equity holders are not entitled to any recovery.").

Each of these cases involved the specific situation cited as an example in the House Report passage quoted above—namely, payment of more than 100 cents on the dollar to creditors. The situation in the present case was not mentioned in the House Report, but it is potentially analogous: If Ms. Liu were correct that the Debtor's equity has value, the Plan would take that value for no consideration and give it to another party (Dr. Hu). While this value would be transferred to an acquiror in one case and to creditors in another, the unfairness to equity holders is the same: In both cases, the plan takes their property for no consideration.

a plan need only comply with one of these two subsections, not both. Such a result would violate the established principle that "a specific provision [section 1129(b)(2)(C)] takes precedence over a more general one [section 1129(b)(1)]." *Davis v. Shah*, 821 F.3d 231, 251 (2d Cir. 2016) (quotation omitted); *accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-47, 132 S. Ct. 2065, 2070-72, 182 L. Ed. 2d 967 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general.") (quotation omitted).

The solution the Court adopts is to enforce section 1129(b)(2)(C)'s specific provisions but to construe them in a manner that does not nullify section 1129(b)(1)'s fair and equitable mandate. Thus, if a plan satisfies subsection (ii), the court must give effect to section 1129(b)(2)(C) by excusing compliance with subsection (i)—that is, relieving the plan proponent of the burden of presenting affirmative proof, let alone a formal valuation, showing that the equity has no value. However, if an objector presents evidence that the equity may have value—as Ms. Liu has done in this case—section 1129(b)(2)(C) does not require the court to ignore that evidence. To the contrary, the court in that event must determine whether the objector has proved that the equity has value and, if so, whether the plan fails to satisfy the fair and equitable requirement as a result.

This resolution harmonizes the conflicting statutory provisions by prohibiting a manifestly unfair outcome, while at the same time giving meaningful practical effect to section 1129(b)(2)(C)(ii). Under this interpretation, a plan proponent that satisfies subsection (ii) is spared the burden of presenting a full-fledged valuation, except to the extent needed to respond to any proof of value that objecting parties may present. This is no small matter, considering the substantial burden and expense that bankruptcy valuation battles can entail, including expert testimony and often multi-day trials. *See* CHARLES J. TABB, LAW OF BANKRUPTCY § 11.34 at 1171 (5th ed. 2020). While in some cases a full-fledged valuation battle may be unavoidable, *see supra*

note 17 (discussing *LightSquared*), more commonly a plan proponent that satisfies subsection (ii) either will not need to present any valuation proof or, as in the present case, will need to respond to the objector's valuation evidence but not present a formal valuation of its own.

In the Court's view, this construction strikes a proper balance between the specific requirements of section 1129(b)(2)(C) and the more general fair and equitable mandate of section 1129(b)(1). By giving effect to both sets of provisions, the Court follows the basic precept that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 173 L.Ed.2d 443 (2009) (cleaned up).

> ii.    *The Record Does Not Demonstrate That the Debtor's Equity Has Value.*

As noted, Ms. Liu claims her plan shows the Debtor's equity has value. While the Court has given this contention serious consideration, the Court ultimately finds, for the reasons discussed below, that the record of the confirmation hearing does not support this claim.

The parties have presented two sorts of evidence bearing on whether the Debtor's equity has value: evidence of the Debtor's value as a standalone business, and of its value to a potential acquiror. The record is clear that the Debtor has no equity value on a standalone basis, but the issue of the Debtor's value to an acquiror is more complicated. The Court addresses these two issues in turn.

> 1.    The Debtor has no equity value on a standalone basis.

The Court finds, on the basis of Mr. Huebscher's extensive and unrebutted testimony concerning the Debtor's operations and finances, that the Debtor has minimal value—and no equity value—as a standalone entity. Mr. Huebscher testified that, shortly after the petition date, Ms. Liu "gutted" the Debtor by transferring all employees to KJD. Since that time, the Debtor has

38

had no cash flow and no ongoing operations of its own. And even when the Debtor's and KJD's operations and finances are considered on a combined basis, the picture is not dramatically better. According to Mr. Huebscher's analysis, the combined Debtor-KJD enterprise has lost money every year since 2017, with total losses in excess of $6 million and possibly as high as $9 million. Moreover, that combined enterprise is currently cash-flow negative and deeply insolvent. But for Dr. Hu's continuing equity infusions, the Debtor (which now has about $225,000 in unpaid post-petition vendor claims) would be insolvent on an administrative expense basis. The Debtor has no assets other than depreciated assets that have little or no value, such as furniture and fixtures, plus $35,000 in cash.

Mr. Huebscher also testified that, even after his appointment, the Debtor has been unable to obtain post-petition financing because it does not have any marketable assets or any cash flow. This is hardly surprising, given Ms. Liu's transfer of all the Debtor's employees to KJD shortly after the petition date, as well as the absence of any contractual relationship between the Debtor and KJD (the Debtor's only source of revenue) other than the hotly disputed ASA. In addition, Mr. Huebscher testified, even KJD has been unable to obtain financing. Based on these facts, Mr. Huebscher opined, the Debtor has no value as a standalone entity.

2.   Ms. Liu has failed to show that the Debtor's value to an acquiror exceeds the amount of its debts.

Ms. Liu does not seriously dispute that the Debtor has no equity value when viewed on a standalone basis. Instead, she argues that the Debtor has substantial value to an acquiror, as shown by her and Recharge Capital's offer to pay $1 million to Holdings and to pay creditors in full under her latest plan.

No one denies that the Debtor may have significant value to an acquiror. Mr. Huebscher himself noted this, testifying that the Debtor could potentially operate as a valuable business, so

long as it has a plan sponsor that will stabilize its finances and reorganize its operations—a task that will require immediate and future cash infusions, as well as entry into an ASA with a new medical practice partner. Mr. Gu, Recharge Capital's CEO, testified that, in his view, the Debtor has value mainly because it would cost about $4 million to build a comparable facility from the ground up. According to Mr. Gu, the total $2.1 million investment that Recharge and Ms. Liu would make under her plan ($1.1 million to creditors and $1 million to equity) is a fair price that takes into account both the risks posed by the Debtor's historical performance and the future capital infusions that Recharge would need to make to bring the facility up to its standards.

If multiple timely and confirmable offers to acquire the Debtor were before the Court, the price paid by the highest and best offer would generally be the best measure of the Debtor's value. *See In re Granite Broad. Corp.*, 369 B.R. 120, 147 (Bankr. S.D.N.Y. 2007) ("one calculates market value by considering what a willing buyer is willing to pay a willing seller"). But that is not the case here. The Debtor has been in bankruptcy for 14 months, and exclusivity expired more than eight months ago. Only two parties—both insiders—have expressed an interest in acquiring its business: Dr. Hu, whose plan values the Debtor's equity at zero, and Ms. Liu (partnered initially with Dr. Doody and now with Recharge Capital), whose current plan values the equity at $1 million. The question, then, is whether to treat Dr. Hu's plan as the only real offer on the table, or instead to value the Debtor based on the price Ms. Liu's latest plan would pay.

The Court concludes that, for three reasons, it would be inappropriate to value the Debtor based on the price Ms. Liu's plan would pay.

*First*, Ms. Liu's plan is unacceptably late. Dr. Hu filed his plan in late March and would have gone to a confirmation hearing in mid-May had he not agreed to Mr. Huebscher's request to delay confirmation. Ms. Liu did not file a plan until July 3—more than three months after the Court

ordered the appointment of a trustee, and just six days before the scheduled start of the confirmation hearing on Dr. Hu's plan. Moreover, the financial backing for Ms. Liu's July 3 plan was subject to major contingencies, including Recharge's due diligence. As Mr. Huebscher testified, her plan as of the start of the confirmation hearing was "so fully underdeveloped" and "lacking [in] any clarity whatsoever" that he could not assess its potential viability. *See* Jul. 11 Tr. 263:3-17. It was only on the evening of July 16, less than 14 hours before the start of the final day of testimony on Dr. Hu's plan, that Ms. Liu filed an amended Recharge commitment letter that eliminated the principal contingencies. And Ms. Liu still has not filed a disclosure statement, which may be required for her plan because (unlike Dr. Hu's plan) it renders Holdings impaired and entitled to vote. *See* Liu Plan § 2.3.4; 11 U.S.C. § 1125(b); *In re Feldman*, 53 B.R. at 359.

Timing matters. A prompt exit from bankruptcy is often important, and delays in confirming a plan of reorganization can cause real harm to the debtor, its creditors and other affected parties. Bankruptcy courts therefore need to be able to set and to enforce schedules for plan confirmation. Limiting the ability of objectors to delay confirmation, including by proposing last-minute plans of their own, is an essential part of bankruptcy case management. *See, e.g., In re 85 Flatbush RHO Mezz LLC*, No. 22-CV-6233 (CS), 2022 WL 11820407, at *16-17 (S.D.N.Y. Oct. 20, 2022) (affirming Judge Drain's decision, at confirmation, not to consider a competing plan that was untimely and appeared not to be confirmable).

In the present case, delaying confirmation of Dr. Hu's plan to permit a combined confirmation hearing on the two competing plans would entail significant costs and risks, particularly because the Debtor, together with KJD, operates a fertility clinic, whose patients are dependent on continuity of care. *See*, e.g., *In re Oakland Physicians Med. Ctr., L.L.C.*, No. 15-51011-WSD, 2016 WL 424810, at *5 (Bankr. E.D. Mich. Feb. 2, 2016) ("The very fact that Debtor

is an operating [medical facility] in a deteriorating financial situation, with patients to care for and employees likely concerned about their futures, dictates the necessity for a deliberate and concentrated, if not accelerated, confirmation timetable and process encompassing few, if any, delays."). Moreover, because the Debtor-KJD enterprise is cash flow negative, any delay would require ongoing cash contributions by Dr. Hu, Ms. Liu or Recharge. If such funding was not forthcoming, the business could collapse, with potentially disastrous results for its fertility patients. The risk of such a collapse appears to be low—both Dr. Hu and Mr. Gu testified that they were prepared to fund the enterprise as needed through the conclusion of any joint confirmation hearing—but it is not zero.

*Second*, while confirmation of Ms. Liu's plan is not before the Court, it is far from clear that Ms. Liu's plan would satisfy the Bankruptcy Code's confirmation requirements. Most notably, Ms. Liu has provided scant assurance that she will be able to supply the funding she is required to contribute, which is needed for her plan to be feasible.[18] At minimum, she must fund over $394,000 by the effective date to pay allowed claims and to provide working capital for ongoing operations. In addition, she may be required to pay as much as $1.9 million more in the months or years after the effective date to cover any eventual allowed claims that exceed those scheduled in her plan supplement. These would include any chapter 11 trustee fees that exceed her plan's estimates, any allowed administrative claim of Dr. Hu (including for his $150,000 in post-petition funding of the Debtor, plus his alleged substantial contribution claim), any fees awarded to Debtor's counsel for

---

[18] The Court has no reason to doubt Recharge's willingness or ability to fund its obligations under her plan. However, if Ms. Liu defaulted in meeting her own funding obligations, there is no guaranty that Recharge would cover any resulting shortfalls.

his work prior to the trustee's appointment, and any amounts eventually awarded to the plaintiff in the pending employment discrimination lawsuit.

The only evidence in the record to support Ms. Liu's ability to pay these amounts is a bank statement showing a balance of about $510,000 in the account of an LLC by the name of "AK20 Holding LLC," together with Ms. Liu's testimony that this account is owned by her husband and that she plans to use these funds to satisfy her obligations under her plan. However, Ms. Liu offered no testimony or evidence that her husband has agreed to let her use these monies to satisfy her plan funding obligations, or that she is otherwise authorized to use the money. Nor did she explain how she plans to fund her obligations to the extent they exceed $510,000. These are big holes in her confirmation case—and given Ms. Liu's prior conduct in this case, as well as her lack of credibility as a witness both at both the confirmation hearing and the earlier hearing on appointment of a trustee, the Court is less willing than it might otherwise be to give her the benefit of the doubt.[19]

*Third*, even if Ms. Liu were able to surmount these confirmation issues, it is not clear that confirmation of her plan would necessarily be a better outcome for affected constituencies than confirmation of Dr. Hu's plan. If faced with two competing confirmable plans, the Court might choose to confirm Dr. Hu's plan over Ms. Liu's. *See* 11 U.S.C. § 1129(c) (addressing court's choice between competing plans); *see generally* 7 COLLIER ON BANKRUPTCY at ¶ 1129.06 (16th

---

[19] Ms. Liu's plan may suffer from additional confirmation defects as well, which Dr. Hu has not yet had a full opportunity to develop. For example, Dr. Hu contends that Ms. Liu's plan was not proposed in good faith—a plausible contention, given the Court's finding that Ms. Liu has engaged in gross misconduct. *See* Dkt.185 at 1-5. In addition, Ms. Liu's plan proposes to pay postpetition interest at the rate of 5.1% per annum to general unsecured creditors—including, apparently, to creditors whose agreement with the Debtor does not entitle them to postpetition interest. While this issue was not briefed, this treatment would pay these creditors more than the full value of their claims, in violation of the so-called "corollary" to the absolute priority rule. *See In re SunEdison, Inc.*, 575 B.R. 220, 227 (Bankr. S.D.N.Y. 2017) ("An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims. . . . If the estate proves to be solvent, the shareholders are entitled to the surplus.").

Ed. 2018) ("[Courts] have identified the following factors as relevant to the choice to be made under section 1129(c): (1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and equity security holders."); 5 COLLIER BANKRUPTCY PRACTICE GUIDE P 90.10 (2024) (courts analyzing 1129(c) may also consider "the effect of each plan on the post-confirmation business of the debtor.").

On its face, Ms. Liu's plan provides more value than Dr. Hu's plan to both creditors and equity holders. It pays unsecured creditors about 6% more on their claims (14 months of post-petition interest at 5.1%), and it pays $1 million, rather than zero, to the Debtor's equity holder, Holdings. However, the 6% differential paid to creditors is modest ($42,000 according to Ms. Liu, *see* Dkt. 177 p. 20, but in fact less than $20,000 for the undisputed claims), and no creditors have come forward to express a preference for Ms. Liu's plan over Dr. Hu's. Moreover, the biggest potential claim is a disputed $1 million employment discrimination claim, and as just noted, it is uncertain whether the funding to pay that claim, if eventually allowed, will be available.

As for equity, the majority of the ultimate equity owners prefer Dr. Hu's plan. Although Holdings itself is deemed to reject Dr. Hu's plan under section 1126(g), Holdings' 70% owner—Dr. Hu—supports his plan and opposes Ms. Liu's plan. Dr. Doody, a 15% owner of Holdings, testified that he supports Dr. Hu's plan and would prefer that it be confirmed over Ms. Liu's plan. Thus, 85% of the ultimate equity holders—all but Ms. Liu—support Dr. Hu's plan.

The Court need not decide, at this juncture, what to make of the curious fact that equity holders prefer a plan that would pay them $1 million less. The Court finds merely that it is not obvious which of the two plans would best serve the interests and preferences of creditors and equityholders. But the same is not true of the interests of another key constituency: the Debtor's patients. Confirmation of Ms. Liu's plan has the potential to disrupt patient care, perhaps quite

44

substantially. As Mr. Huebscher and Dr. Doody testified, it is highly uncertain whether Dr. Thornton and his medical staff would agree to partner with the reorganized debtor under Ms. Liu's plan. To the extent these doctors were unwilling to sign on, each patient would be forced to choose between following Dr. Thornton and his colleagues to their new practice location—and potentially facing complications and risks regarding the transfer of eggs, embryos and medical information— or alternatively, undergoing fertility treatments with whatever new doctor Ms. Liu and Recharge were able to obtain. Under Dr. Hu's plan, patients face no such risk, as Dr. Thornton and his colleagues are expected to remain in place. These considerations are entitled to significant weight. *See, e.g., In re River Vill. Assocs.*, 161 B.R. 127, 143 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995) (a plan that allows debtor to "'continue to operate [and] provide its employees with jobs'" may be preferable to a liquidating plan) (quoting H.R. Rep. 95-595 at 220); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 352 (Bankr. D. Del. 2004) (confirming trustee's plan over equity's plan in part because equity's plan "presents more uncertainty than the Trustee's Plan"). Consequently, even if Ms. Liu's plan were able to satisfy the Code's confirmation requirements, it is far from clear that the Court would choose to confirm that plan instead of Dr. Hu's.

## IV.    CONCLUSION

For the reasons stated above, the Plan satisfies the Bankruptcy Code's confirmation requirements. The Court will enter an appropriate confirmation order.

Dated: New York, New York
      September 7, 2024

/s/ Philip Bentley
**Honorable Philip Bentley**
**United States Bankruptcy Judge**